## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

**BRIAN ROLLER**                             :
**d/b/a KALOS STREET L.L.C.,**               :          **CIVIL ACTION**
                                             :
       **Plaintiff,**                  :
                                             :
       **v.**                         :          **No. 18-1834**
                                             :
**RED PAYMENTS L.L.C. and FIRST DATA**       :
**GLOBAL LEASING,**                          :
                                             :
       **Defendants.**                 :
_____:

**Goldberg, J.**                                              **August 12, 2019**

### MEMORANDUM OPINION

This is a putative class action asserting claims for, among other things, fraud and unjust enrichment against two companies that provide credit and debit card processing equipment and services to merchants. The named Plaintiff, Brian Roller, owns a business that entered into an agreement with Defendants, Red Payments LLC ("Red Payments") and First Data Global Leasing ("First Data"), to lease certain equipment. Thereafter, according to Plaintiff, he received and was charged for additional equipment that he did not agree to lease. Defendants allegedly refused to refund Plaintiff for these charges, continued to demand that Plaintiff pay for the unwanted equipment, and, when Plaintiff refused, referred the matter to a debt collector.

First Data has moved to transfer this case to the United States District Court for the Eastern District of New York, pursuant to 28 U.S.C. § 1404(a), relying on a forum selection clause contained in a booklet that First Data contends was incorporated by reference into the parties' agreement. Plaintiff opposes transfer, arguing, among other things, that he never received the booklet containing the clause, and that this matter is not within the scope of the forum selection clause.

For the reasons that follow, First Data's motion will be granted, and I will transfer the entire case to the Eastern District of New York.

## I.    FACTUAL & PROCEDURAL BACKGROUND

The following facts are derived from Plaintiff's Class Action Complaint and the parties' briefs on the transfer motion, along with the exhibits attached thereto.

Plaintiff Brian Roller is a Pennsylvania resident who operates a retail gym in Broomall, Pennsylvania, through his company, Kalos Street, L.L.C. Defendants are Red Payments, a New York company, and First Data, a Delaware company with its principal place of business in Georgia. (Compl. ¶¶ 19–21.)

Red Payments and First Data are in the business of providing credit and debit card processing equipment and services to merchants whose customers pay by card. Red Payments acts as a middleman for First Data by "marketing and selling payment processing services run by First Data. . . . Red Payments signs up small businesses, offering payment processing services to merchants throughout the country and customer service on those accounts." First Data "actually performs the payment processing services sold by Red Payments," and "leases or sells the . . . equipment to facilitate credit or debit card transactions (e.g., card readers), and does all the invoicing and billing for the payment processing performed." (Compl. ¶¶ 31, 34.)

In the summer of 2016, Plaintiff decided to obtain card processing equipment and services through Red Payments, after being solicited by one of its sales representatives. Thereafter, on August 22, 2016, Plaintiff executed a document entitled "Merchant Application & Agreement." Contained in this three-page agreement is a "Lease Order," providing that Plaintiff would lease from First Data certain card-processing equipment—specifically, a "Gateway Virtual Terminal" and a "USB Card Swiper." (I will refer to this agreement hereinafter as the "Gateway Merchant

2

Agreement.") Plaintiff received the equipment listed in the Gateway Merchant Agreement and began using it for processing card payments. (Compl. ¶¶ 39–40, Ex. A.)

According to the Complaint, "within the first week" of service, Plaintiff received a shipment containing additional card-processing equipment—specifically, "mobile payment card readers" that are "referred to as Vx520s." Plaintiff alleges that he did not request this equipment or agree to lease it, but that Defendants nevertheless began to charge him for it. Plaintiff allegedly protested to his Red Payments sales representative, who allegedly responded that "the equipment was part of a scam perpetrated by Defendants to slam him with a second account." (Compl. ¶¶ 42, 44.)

Plaintiff claims that he made several failed attempts to obtain a refund from Defendants for these additional charges. Plaintiff also alleges that he refused to pay further invoices and that he "switched to a new payment processor," after which Red Payments added a cancelation fee to his account. According to Plaintiff, Defendants have continued to demand payment, and have sent the unpaid invoices to a debt collector. (Compl. ¶¶ 48, 50.)

For its part, Red Payments asserts that Plaintiff signed a separate document with a lease order covering the allegedly unwanted Vx520s. This document, like the Gateway Merchant Agreement, is entitled "Merchant Application and Agreement." And the document appears identical to the Gateway Merchant Agreement in every other way, except that it lists the Vx520s rather than the Gateway Virtual Terminal and USB Card Swiper as the equipment to be leased. Red Payments has provided Plaintiff with a copy of this document, which I will refer to hereinafter as the "Vx520 Merchant Agreement." But Plaintiff maintains that this document is a forgery.[1]

---

[1] Red Payments brought this document to my attention in its July 9, 2018, letter requesting a pre-motion conference to discuss its proposed motion to dismiss, pursuant to my procedure for Rule 12(b) motions. Because Plaintiff responded to Red Payments' letter by noting that he had never seen this document despite multiple requests for it, I ordered Red Payments to produce it to Plaintiff, in an effort to facilitate a resolution of Red Payments' proposed motion to dismiss through my pre-motion procedures.

Plaintiff initiated this putative class action, asserting claims on behalf of himself and other "United States persons or entities for whom Defendants . . . opened an account . . . for payment processing services . . . that was never used . . . and was opened without that person or entity's lawfully-obtained consent." (Compl. ¶ 53.) In addition to a claim seeking a judicial declaration that no binding contract exists as to the Vx520s, Plaintiff asserts claims for unjust enrichment, conversion, fraud, negligence, and violations of the Fair Credit Reporting Act and Electronic Funds Transfer Act.

First Data has moved to transfer this matter to the United States District Court for the Eastern District of New York, pursuant to 28 U.S.C. § 1404(a), based on a forum selection clause that First Data contends Plaintiff agreed to when executing the Gateway Merchant Agreement.[2] Specifically, First Data contends that the Gateway Merchant Agreement incorporated by reference a document referred to as the "MA&A booklet" (hereinafter "the Booklet"). The Gateway Merchant Agreement includes an acknowledgment that Plaintiff received the Booklet and agreed to the terms contained in it. This acknowledgement appears just above Plaintiff's signature:

> By its signature below, Client [i.e., Plaintiff] acknowledges that it has received (either in person, by facsimile, or by electronic transmission) the complete MA&A booklet consisting of 12 pages (including the confirmation).

> Merchant [i.e., Plaintiff] further acknowledges reading and agreeing to all terms in the MA&A booklet, which shall be incorporated into the MA&A [i.e., Gateway Merchant Agreement] . . . .

> Merchant understands that a copy of the MA&A terms booklet is also available for downloading from the Internet at:

> https://www.mybackofficetools.com

---

[2] In the alternative, First Data has moved to dismiss Plaintiff's claims for violations of the Fair Credit Reporting Act and Electronic Funds Transfer Act, pursuant to Rule 12(b)(6). Likewise, Red Payments has moved to dismiss Plaintiff's Class Action Complaint, in its entirety, under Rule 12(b)(6), but also consents to First Data's transfer motion. Because I will grant First Data's transfer motion and transfer this matter, in its entirety, to the Eastern District of New York, I will deny the other pending motions without prejudice to refile following transfer.

(Compl., Ex. A., at 4.)

Plaintiff did not attach the Booklet to his Complaint. But First Data has attached to its transfer motion a document that it contends is the Booklet. Within the Booklet is a two page "Lease Agreement" that includes both a choice-of-law clause and a forum selection clause, the latter of which is italicized below:

> **1.15 Governing Law; Venue; Miscellaneous.** This Lease Agreement shall be governed by and will be construed in accordance with the laws of the State of New York (without applying its conflicts of laws principles). *The exclusive venue for any actions or claims arising under or related to this Lease Agreement shall be in the appropriate state of federal court [sic, read "state or federal court"] located in Suffolk County, New York.* If any part of this Lease Agreement is not enforceable, the remaining provisions will remain valid and enforceable.

(First Data.'s Mot., Ex. C., at 12, 14 (emphasis added).)

Plaintiff opposes transfer, arguing that: (1) this action is outside the scope of the forum selection clause; (2) the Booklet containing the forum selection clause was not incorporated into the Gateway Merchant Agreement, because the Booklet was never provided; (3) First Data lacks standing to enforce the forum selection clause because it is not a party to the Booklet; and (4) the Booklet never went into effect because it was not signed by an entity called BMO Harris Bank, an entity that is not a party to this case.

For the reasons set out below, I reject each of Plaintiff's arguments, and will enforce the forum selection clause, transferring this matter in its entirety to the Eastern District of New York.

## II.    LEGAL STANDARD

Under 28 U.S.C. § 1404(a), a district court may transfer an action to any other district "where it might have been brought" if this transfer is "for the convenience of parties and witnesses" and "in the interest of justice." 28 U.S.C. § 1404(a). A court faced with a request to transfer venue under § 1404(a) typically undertakes a balancing test comprised of various public and private interest factors, including the preferences of the parties. See Jumara v. State Farm Ins. Co., 55 F.3d 873,

877–878 (3d Cir. 1995). But where the parties contractually agreed as to the appropriate forum for resolution of the dispute—through a valid forum selection clause—the analysis is different. See In re McGraw-Hill Global Educ. Holdings LLC, 909 F.3d 48, 57 (3d Cir. 2018). In that case, the court "does not consider arguments about the parties' private interests," but "[i]nstead . . . may consider arguments about public-interest factors only." Id. (internal quotation marks omitted) (quoting Atl. Marine Constr. Co. v. U.S. Dist. Court, 571 U.S. 49, 64 (2013)).

The public-interest factors include: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) considerations of administrative difficulty resulting from court congestion; (4) the local interest in deciding controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases. Jumara, 55 F.3d at 879. But as the Supreme Court has explained, these factors "will rarely defeat a transfer motion" premised on a valid forum selection clause, and thus, "[i]n all but the most unusual cases, the parties will be held to their bargained-for choice of forum." Atl. Marine Constr. Co., 571 U.S. at 64.

The party seeking a transfer under § 1404(a) generally "bears the burden of persuasion." In re McGraw-Hill Global Educ. Holdings LLC, 909 F.3d at 57. But where there is a valid forum selection clause covering the action, the party seeking to avoid the clause "must bear the burden of showing that the public-interest factors overwhelmingly disfavor a transfer." Atl. Marine Constr. Co., 571 U.S. at 67.

In deciding a § 1404(a) motion, a court is not limited to the pleadings, and may consider affidavits and other evidence. See Fellner ex rel. Estate of Fellner v. Phila. Toboggan Coasters, Inc., No. 05-cv-1052, 2005 WL 2660351, at *4 (E.D. Pa. Oct. 18, 2005); see also Atl. Marine Constr. Co., 571 U.S. at 61 n.4 (explaining that, unlike a motion to dismiss under Federal Rule of Civil

Procedure 12(b)(6), a district judge considering a motion to transfer under § 1404(a) may resolve disputed issues of material fact).[3]

## III.    DISCUSSION

In opposing First Data's motion to transfer, Plaintiff challenges only the existence and applicability of the forum selection clause; he does not offer any reason why, assuming the forum selection clause is binding and applicable, the public-interest factors counsel against enforcing it under § 1404(a).

Plaintiff offers four reasons why the forum selection clause is inapplicable to this action: (1) this action is outside the scope of the forum selection clause; (2) the Booklet containing the forum selection clause was not incorporated into the Gateway Merchant Agreement, because the Booklet was never provided to him; (3) First Data lacks standing to enforce the forum selection clause because it is not a party to the Booklet; and (4) the Booklet never became effective because it was not signed by an entity called BMO Harris Bank, an entity that is not a party to this case. For the following reasons, none of these arguments prevents transfer.

### A.  *This Action Is Within the Scope of the Forum Selection Clause.*

Plaintiff first argues that this action is outside the scope of the forum selection clause contained in the Booklet. Plaintiff's argument is two-fold. First, Plaintiff contends that the Vx520 Merchant Agreement is a forgery, and thus the terms of the Booklet—including the forum selection clause contained in it—cannot be applied to Plaintiff's claims concerning the allegedly unwanted Vx520s. This argument is easily dispensed with, as First Data does not rely on the allegedly forged Vx520 Merchant Agreement in seeking enforcement of the forum selection clause. Rather, First

---

[3] Plaintiff maintains that I may not consider matters outside of the pleadings because First Data's motion is made under Rule 12(b)(6). However, the Motion invokes § 1404(a) as the basis for transfer. (See First Data's Mot., Doc. No. 19, at 1.)

Data contends that the Booklet was incorporated by reference into the *Gateway Merchant Agreement*, which Plaintiff admits to signing and which contains the same language incorporating the Booklet by reference as the Vx520 Merchant Agreement.

Requiring closer consideration is Plaintiff's second argument: that his claims are outside of the scope of the forum selection clause, even when considering the Booklet as incorporated into the Gateway Merchant Agreement. In other words, Plaintiff contends that because his claims do not pertain to the equipment specified in the Gateway Merchant Agreement—the USB Card Swiper and the Gateway Virtual Terminal—but rather concern the Vx520s, the claims are not within the scope of the forum selection clause. First Data responds that the clause covers Plaintiff's claims because those claims are related to the Gateway Merchant Agreement.

I agree with First Data. Again, the language of the forum selection clause is set out in a two-page "Lease Agreement" contained in the Booklet, and reads:

> The exclusive venue for any actions or claims arising under *or related to* this Lease Agreement shall be in the appropriate state o[r] federal court located in Suffolk County, New York.

(First Data's Mot., Ex. C., at 14 (emphasis added).) Thus, the clause covers not only any claim "arising under" the Lease Agreement; but also any claim "related to" the Lease Agreement.

First Data does not appear to contend that Plaintiff's claims "aris[e] under" the Lease Agreement. Indeed, as Plaintiff correctly notes, his claims concern additional equipment (the Vx520s) that were not listed in the "Lease Order" section of the Gateway Merchant Agreement, and thus are not covered by the Lease Agreement contained in the Booklet, as incorporated into the Gateway Merchant Agreement. But Plaintiff's claims are nevertheless "related to" the Lease Agreement because they are factually intertwined with the Gateway Merchant Agreement, into which the Booklet is incorporated, and because the Gateway Merchant Agreement established the business relationship between Plaintiff and Defendants out of which Plaintiff's claims arise.

"The question of the scope of a forum selection clause is one of contact interpretation," and is thus governed by state law. In re McGraw-Hill Global Educ. Holdings LLC, 909 F.3d 48, 58 (3d Cir. 2018). The applicable state law is that of New York, in light of the choice-of-law provision in the Booklet providing that the Lease Agreement is to be "construed in accordance with the laws of the State of New York." (First Data's Mot., Ex. C., at 14.)

Like the law of other jurisdictions, New York law requires that "[t]he words and phrases used by the parties . . . be given their plain meaning." Brooke Group Ltd. V. JCH Syndicate 488, 663 N.E.2d 635, 638 (N.Y. 1996); see also Allied Chemical Corp. v. Alpha Portland Indus., Inc., 397 N.Y.S.2d 480, 582 (N.Y. App. Div. 1977) (noting that a "fundamental principle" of contract interpretation is that "the words in a contract should retain their plain and ordinary meaning unless the context mandates a different interpretation"). To determine the plain meaning of a word or phrase in a contract, "it is common practice for the courts of [New York] to refer to the dictionary." Mazzola v. Cnty of Suffolk, 533 N.Y.S.2d 297, 297 (N.Y. App. Div. 1988).

Dictionaries confirm that the phrase "related to" broadly describes any logical relationship between two or more things. See Webster's Third New International Dictionary, available at http://unabridged.merriam-webster.com/unabridged/related (last accessed July 31, 2019) (defining "related" as "having relationship: connected by reason of an established or discoverable relation); Oxford English Dictionary Online, available at https://www.oed.com/view/Entry/ 161808?rskey=81pNf0&result=2 (last accessed July 31, 2019) (defining "related" as "connected or having relation to something else"). Thus, a thing is "related to" another thing if the two things bear some logical relationship.

Applying this plain, common-sense meaning, courts have consistently concluded that similar forum selection clauses—those that use phrases such as "claims relating to" or "claims arising in relation to" an agreement—broadly cover those claims that concern the business

relationship surrounding that agreement. See, e.g., CQ, Inc. v. TXU Mining Co., L.P., No. 05-cv-1230, 2006 WL 278155, at *3 (W.D. Pa. Feb. 3, 2006) (concluding that a clause encompassing "any cause of action relating to the Agreement" was broad enough to cover any claim that "has its factual basis in the contractual business relationship between the parties"); John Wyeth & Brother Ltd. v. Cigna Int'l Corp., 119 F.3d 1070, 1076 (3d Cir. 1997) (holding that the phrase "arising in relation to this Agreement" encompassed any claim that had a "logical or causal connection" to the Agreement, even if the claim was not "based on" the Agreement); Prod. Res. Grp., LLC v. Martin Prof'l, A/S, 907 F. Supp. 2d 401, 414–15 (S.D.N.Y. 2012) (holding that a forum selection clause encompassing claims "relating to" a contract was "broad," and covered claims even though they were not "base[d]" on the contract).

        As in these cases, here, Plaintiff's claims are within the scope of the forum selection clause. While they may not "arise under" the Lease Agreement as incorporated into the Gateway Merchant Agreement, they arise out of the business relationship established by those agreements—and thus are "related to" those agreements. Indeed, the facts alleged in the Complaint confirm that these allegations are "related to"—indeed, revolve around—the execution and performance of those agreements: Plaintiff was approached by a Red Payments sales representative; he decided to lease certain equipment through Red Payments; he *executed the Gateway Merchant Agreement specifying that equipment*; then, within the first week of service, he received additional equipment that he did not agree to lease *in that agreement*. Because these agreements established the business relationship forming the factual basis for Plaintiff's claims, those claims fall within the scope of the forum selection clause.

**B.  Plaintiff is Bound by the Terms of the Booklet Regardless of Whether He Actually Read or Received It.**

Plaintiff next contends that the terms of the Booklet—including the forum selection clause—cannot be enforced because "he never saw, heard of, received, or signed" it. (Pl.'s Opp'n 12.) First Data responds that whether Plaintiff, in fact, read or received the Booklet is irrelevant because Plaintiff acknowledged receiving the Booklet and accepted its terms when he signed the Gateway Merchant Agreement.

Under both Pennsylvania and New York law,[4] a party's failure to read the terms of a contract does not make those terms any less binding. See, e.g., Simeone v. Simeone, 581 A.2d 162, 165 (Pa. 1990) ("Contracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood . . . ."); Gillman v. Chase Manhattan Bank, N.A., 534 N.E.2d 824, 828–29 (N.Y. 1988) (holding that a party is "conclusively bound" by an agreement "irrespective of . . . testimony that he did not read it and was unaware of its terms"). It follows that, where a contract incorporates by reference terms set out in a separate document, those terms are binding, regardless of whether the incorporated document was actually read.[5] Courts applying New York or Pennsylvania law have consistently come to this conclusion in enforcing terms set out in incorporated documents. See, e.g., Pentecostal Temple Church v. Streaming Faith, LLC, No. 08-

---

[4] Neither party asserts which state's law controls this question—New York's, in light of the choice-of-law clause in the Booklet, or Pennsylvania's, in light of the fact that Plaintiff challenges whether the Booklet containing the choice-of-law clause is binding. I need not decide that question as the result is the same under either state's law.

[5] It is a settled principle under both New York and Pennsylvania law that a contract can incorporate terms from a separate, unsigned document. See, e.g., Standard Bent Glass Corp v. Glassrobots Oy, 333 F.3d 440, 447 & n.10 (3d Cir. 2003) (holding that, under Pennsylvania law, "[i]ncorporation by reference is proper where the underlying contract makes clear reference to a separate document, the identity of the separate document may be ascertained, and incorporation of the document will not result in surprise or hardship"); PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1201 (2d Cir. 1996) ("Under New York law, 'a paper referred to in a written instrument and sufficiently described may be part of the instrument as if incorporated into the body of it.'" (quoting Jones v. Cunard S.S. Co., 263 N.Y.S. 769, 771 (N.Y. App. Div. 1933)).

cv-554, 2008 WL 4279842, at *5 (W.D. Pa. Sept. 16, 2008) (holding that the plaintiff was bound by a forum selection clause on a website that was incorporated into a contract, and noting that the plaintiff's failure to read the website did not excuse compliance); PaineWebber Inc., 81 F.3d at 1201 ("[A] party's failure to read a duly incorporated document will not excuse the obligation to be bound by its terms . . . .).

Likewise, the fact that a party did not actually *receive* an incorporated document does not make the document any less binding, provided that the party acknowledged receiving the document when signing the contract into which the document was incorporated. See, e.g., Bakery Barn, Inc. v. A.E. Nielsen Maskinfabrik ApS, No. 12-cv-75, 2013 WL 2237687, at *2 (W.D. Pa. May 21, 2013) (enforcing forum selection clause against a party that contended it never received a copy of the incorporated document that contained the clause, and noting that the party "had a duty to inquire as to the content of the terms that [the opposing party] sought to incorporate by reference"); Bank Leumi USA v. Ehrlich, 98 F. Supp. 3d 637, 650 (S.D.N.Y. 2015) (enforcing forum selection clause despite a party's argument that the document containing the clause was never received, and noting that the party had acknowledged receipt of the document in signing the contract).

Thus, regardless of whether Plaintiff actually received and read the Booklet, he is bound by its terms, including the forum selection clause. In executing the Gateway Merchant Agreement, Plaintiff acknowledged that he "received . . . the complete MA&A booklet" and "further acknowledge[d] reading and agreeing to all terms in the MA&A booklet." (Compl., Ex. A, at 4.) Having acknowledged receipt of, and agreement to, the terms of the Booklet, he cannot now avoid being bound by those terms merely by declaring that he never received or read it.

Relatedly, Plaintiff calls into question the authenticity of the Booklet attached to First Data's transfer motion, maintaining that First Data "does not . . . appear to attach the correct version of the Booklet to its motion." (Pl.'s Opp'n 11.) In support of this assertion, Plaintiff points out a minor

discrepancy between the "confirmation page" set out at the end of the Booklet and the nearly identical "confirmation page" at the end of the Gateway Merchant Agreement. Specifically, Plaintiff notes that, while the confirmation page at the end of the Gateway Merchant Agreement states that the Booklet "consist[s] of 12 pages (including the confirmation)," the Booklet that First Data attached to its transfer motion is 14 pages including the confirmation page, and, indeed, itself states that the Booklet is "14 pages (including this confirmation)." (Compare Compl., Ex. A. at 4, with First Data's Mot., Ex. C., at 15.) Similarly minor, while the Gateway Merchant Agreement's confirmation page states that the Booklet is available at a certain Internet address ("https://www.backofficetools.com"), the Booklet's confirmation page provides a slightly different address ("https://www.mybackofficetools.com/vimas").

As originally filed, First Data's transfer motion pointed to no evidence of record that the Booklet is authentic. Rather, First Data relied solely on its counsel's representations in the transfer motion that the document attached to the motion is, in fact, the Booklet at issue. In light of this, and mindful that a court may, on a § 1404(a) motion, consider evidence and resolve disputed issues of fact, I asked counsel for First Data at oral argument how it could prove the authenticity of the Booklet. In response, First Data asked if it could supplement its transfer motion with a declaration as to this issue. I granted this request, and also permitted Plaintiff to respond with any declaration or other evidence of his own. (See 7/10/2019 Or., Doc. No. 42.)

Thereafter, First Data submitted a declaration from Red Payments' Director of Client Services since 2014, Farah Margolin. (See Margolin Decl. ¶ 2.) In it, Ms. Margolin declares that she has personal knowledge of Red Payments' "merchant agreements and related documents," as well as "the manner in which" they are "created, executed and maintained." (Id. ¶ 3) Based on this knowledge, Ms. Margolin declares that the Booklet attached to First Data's transfer motion "is the same and only version that Red Payments was using in its business generally when Plaintiff signed

the Gateway [Merchant Agreement] in August 2016." (Id. ¶ 9.) While Ms. Margolin makes no representations about whether Plaintiff, specifically, was provided the Booklet, she declares that "[i]t is Red Payments' business practice to provide the Booklet to merchants when they sign the [merchant agreement] either in person, by facsimile, or by electronic transmission." (Id. ¶ 10.) Ms. Margolin further declares that, in any event, "Plaintiff could have called, emailed, or faxed Red Payments to request another copy" of the Booklet. (Id. ¶ 12.)

Plaintiff responded with a declaration from the Red Payments sales representative who was present when Plaintiff signed the Gateway Merchant Agreement in August 2016, Ed Curtis. (See Curtis Decl. ¶¶ 2–3.) Mr. Curtis declares that—during his approximately two-month tenure as a sales representative for Red Payments—he was "never made aware" of the Booklet, and "never showed it or mentioned it to [Plaintiff] or any of [his] other customers." (Id. ¶ 4.) Thus, Mr. Curtis declares, Ms. Margolin's statement that Red Payments' practice was to provide customers with a copy of the Booklet is "inconsistent with [his] training and [his] understanding of Red Payments' business practice." (Id. ¶ 18).

Having considered these declarations, I conclude that First Data has carried its burden of establishing the authenticity of the Booklet attached to its transfer motion. Critically, and for the reasons discussed at length above, First Data need not establish that Plaintiff ever, in fact, received a copy of the Booklet, because it is sufficient to bind Plaintiff that he acknowledged receiving the Booklet when he signed the Gateway Merchant Agreement.

But while First Data need not establish that Plaintiff ever *received* the Booklet, it still must establish the *authenticity* of the document it claims to be the Booklet. That is, First Data must establish that the document it has produced is, in fact, the version of the Booklet that has been incorporated into the Gateway Merchant Agreement. First Data has done so through Ms. Margolin's declaration, in which she declares, based on her personal knowledge, that the document attached to

14

First Data's motion "is the same and only version that Red Payments was using in its business generally when Plaintiff signed the Gateway [Merchant Agreement] in August 2016." (Margolin Decl. ¶ 9.) That fact is critical, because if the version of the Booklet attached to First Data's motion was the only version in use at the time, then that version must be the version that Plaintiff would have received in August 2016. (Again, whether Plaintiff did, in fact, receive it is irrelevant.)

Plaintiff has offered no evidence disputing this critical factual assertion. While Plaintiff and Mr. Curtis have declared that they never knew about the Booklet, and while Mr. Curtis has declared that Red Payments never instructed him to provide the Booklet to customers, these statements—even if true—do not dispute the Booklet's *authenticity*.

Finally, I disagree with Plaintiff's suggestion that he be permitted to explore the authenticity of the Booklet through discovery. A district court may permit the parties to take limited discovery on a § 1404(a) motion when that motion turns on disputed facts. See, e.g., Kuehne Chemical Co. v. Adex Int'l, Inc., No. 14-cv-5630, 2015 WL 1208379, at *1 (D.N.J. Mar. 17, 2015) (permitting limited discovery where "the parties significantly diverge[d]" on a fact bearing on the venue motion—the state where certain discussions took place); see also McDonnell Douglas Corp. v. Polin, 429 F.2d 30, 30 (3d Cir. 1970) (reversing district court that deferred consideration of a § 1404(a) motion pending full merits discovery, and remanding for "discovery solely with respect to the question of transfer").

But here, Plaintiff has identified no facts material to First Data's transfer motion that remain in genuine dispute following the submission of Ms. Margolin's declaration. While Plaintiff is correct that Ms. Margolin has not entirely explained the discrepancy between the confirmation page of the Booklet and that of the Gateway Merchant Agreement,[6] that discrepancy is ultimately

---

[6] As to the discrepancy in the number of pages in the Booklet, Ms. Margolin declares only that, "[w]hile [she] do[es] not know for certain, a plausible explanation for this discrepancy could be that the 'Leasing

15

immaterial. After all, the discrepancy is not between two different versions of the Booklet but between two similar (but unidentical) confirmation pages, one contained in the Booklet, the other in the Gateway Merchant Agreement. Whatever the reason for the discrepancy, what matters is whether First Data has provided the authentic version of the Booklet. And Ms. Margolin has declared—without being contradicted by any other evidence of record—that there was only one version of the Booklet in use in August 2016, and that version is attached to First Data's motion.

In sum, Plaintiff is bound by the terms of the Booklet—including the forum selection clause—regardless of whether he actually read or received it, because he acknowledged receiving it and agreeing to it when executing the Gateway Merchant Agreement. And First Data has sufficiently established that the document it has provided in support of its transfer motion is the version of the Booklet that was incorporated into the Gateway Merchant Agreement.

### C. First Data is a Party to the Lease Agreement Containing the Forum Selection Clause and Thus Has Standing to Enforce It.

Plaintiff next contends that First Data is not "mentioned anywhere in the Booklet," and thus is not a party or signatory to the Booklet such that it has standing to enforce the Booklet's terms. But a review of the Booklet belies Plaintiff's assertion.

The Booklet contains what appear to be two separate agreements. The first of these agreements appears on the first eight pages of the Booklet. That agreement does not have a title or other heading at the top of the page, but begins as follows:

> This Merchant Application and Agreement (also referred to as the "Agreement"), is entered into between the business indicated on the Merchant Application and Agreement ("Merchant" or "you"), Priority Payment Systems ("PPS" or "Processor", and BMO Harris Bank, N.A. ("Bank"). The Processor and Bank may be collectively identified as "we" or "us" within the body of this Agreement.

---

Agreement' at the end of the Booklet appears twice, once in a two-column format and again in a single page format. Although the Leasing Agreement appears in two different formats, the text is the same." (Margolin Decl. ¶ 12.)

(First Data's Mot., Ex. C, at 3.)

Plaintiff focuses only on this agreement, noting that it lists neither First Data nor Red Payments as a party. But there is a second agreement set out in the next four pages of the Booklet. These four pages appear to contain two copies of the same Lease Agreement. Importantly, as discussed above, it is this Lease Agreement that contains the forum selection clause. The Lease Agreement begins as follows:

> This Equipment Lease Agreement ("Lease Agreement") is being entered into by and between _____, hereinafter referred to as "Company", through its business unit First Data Global Leasing and the Lessee identified on the signature panel of this Merchant Application and Agreement ("MA&A"). In this Lease Agreement, the words "we," "our" and "us" refer to Company and its successors and assigns and the words "you" and "your" refer to Lessee and its permitted successors and assigns.

(First Data's Mot., Ex. C., at 11, 13 (emphasis added.))

Because, contrary to Plaintiff's assertion, First Data is a party to the Lease Agreement containing the forum selection clause, First Data has standing to enforce that clause, as it seeks to do here.

### D. The Booklet Is Effective Notwithstanding Any Failure by BMO Harris Bank to Sign the Booklet or the Gateway Merchant Agreement.

Finally, Plaintiff contends that "the Booklet (including its forum-selection clause) never took effect," because the Booklet requires that BMO Harris Bank (an entity that is not a party to this case) sign the Booklet, which the Bank did not do. (Pl.'s Opp'n 13.)

The provision Plaintiff refers to is set out on the "confirmation page" located at the end of the Booklet. As noted above, that confirmation page appears to be substantially identical to the final page of the Gateway Merchant Agreement, which Plaintiff signed. Both contain an identical listing of "Important Member Bank Responsibilities" and "Important Merchant Responsibilities." These

lists are reproduced below, with the relevant item appearing second (item "b.") on the list of Important Member Bank Responsibilities:

**Important Member Bank Responsibilities:**

a. The Bank is the only entity approved to extend acceptance of Card Organization products directly to the merchant.

b. The Bank must be a principal (signer) to the MA&A,

c. The Bank is responsible for educating Merchants on pertinent Visa, MasterCard, Discover and American Express rules with which Merchants must comply; but this information my be provided to you by Processor.

d. The Bank is responsible for and must provide settlement funds to the Merchant.

e. The Bank is responsible for all funds held in reserve that are derived from settlement.

**Important Merchant Responsibilities**

a. Ensure compliance with Cardholder data security and storage requirements.

b. Maintain fraud and Chargebacks below Card Organization thresholds.

c. Review and understand the terms of the MA&A.

d. Comply with Card Organization rules.

e. Retain a signed copy of this Disclosure Page.

f. You may download "Visa Regulations" from Visa's website at: http://usa.visa.com/merchants/operations/op_regulations.html

g. You may download "MasterCard Regulations" from MasterCard's website at: http://www.mastercard.com/us/merchant/supoort/rules/htm

h. You may download the American Express Merchant Operating Guide at: http://www.americanexpress.com/merchantopguide

(Compl., Ex. A., at 4; First Data's Mot., Ex. C., at 15.).

Plaintiff argues that, because "[t]he Bank must be a principal (signer) to the [Gateway Merchant Agreement]," and because the Bank did not sign it, the Booklet (and presumably the Gateway Merchant Agreement, as it contains the same provision) did not become effective. First Data responds that the Bank is not required to sign the Booklet for the forum selection clause to become effective. Again, I agree with First Data.

One party's failure to sign a contract does not, by itself, preclude enforcement of the contract against another party that *did* sign it. See, e.g., Manning v. Michaels, 540 N.Y.S.2d 583, 584 (N.Y. App. Div. 1989). But where the parties to the contract clearly manifested their intent that the contract not become effective until signed by a certain party, a "condition precedent" is created, rendering the contract ineffective until that party has signed. See, e.g., id.; see also 17A Am. Jur. 2d Contracts § 174 (2019). Courts applying New York law have held that, where the parties' intent to create a condition precedent is unclear, interpreting the contract as doing so is disfavored. See Manning, 540 N.Y.S.2d at 584 (declining to interpret a contract as creating a condition precedent requiring the signature of an escrow agent, where the contract provided: "By signing this [contract], [the agent] has agreed to act as escrow agent as provided above."); see also Kass v. Kass, 663 N.Y.S.2d 581, 588 (N.Y. App. Div. 1997) ("As a general rule, it must clearly appear from the agreement itself that the parties intended a provision to operate as a condition precedent.").

Here, it is far from clear that the parties intended that the entirety of the Booklet—and, again, the Gateway Merchant Agreement, as it contains the same provision—not take effect until the Bank signs. Notably, the confirmation page contains only one signature line, and that line indicates that it should be signed by the "client" (i.e., Plaintiff). If the parties intended both the Gateway Merchant Agreement and the Booklet to be ineffective until signed by the Bank, it would be unusual not to provide a place for the Bank's signature.[7]

---

[7] In support of its position that the provision at issue creates a condition precedent, Plaintiff cites a case in which a contract explicitly specified that it "will not take effect unless and until Merchant has been approved by Bank," and then provided a signature line for the Bank to sign indicating its approval. See Liberty Salad, Inc. v. Groundhog Enterprises, Inc., No.17-cv-226, 2018 WL 4566151, at *1–2 (E.D. Pa. Sept. 21, 2018). Liberty Salad is thus distinguishable from this case, in which there is no language in the agreement indicating that it "will not take effect unless and until" the agreement is signed, and in which there is no signature line for the Bank.

It would also be unusual for the parties to have placed a condition precedent requiring a party's signature in the middle of a list of other "responsibilities" that—by their nature—are highly unlikely to be conditions precedent. For example, the list of Important Bank Responsibilities also includes—immediately after the language at issue—"educating Merchants on pertinent Visa, MasterCard, Discover and American Express rules with which Merchants must comply." (Compl., Ex. A., at 4; First Data's Mot., Ex. C., at 15.) And among the responsibilities set out in the adjacent list of Important Merchant Responsibilities are "download[ing]" certain operating manuals and regulations. (Id.) Because it is highly unlikely that "educating Merchants" or downloading regulations were intended by the parties to create conditions precedent, the placement of the provision requiring the Bank to be a "principal (signer)" among such "responsibilities" suggests that the parties also did not intend this provision to create a condition precedent. (Id.)

Moreover, the "Lease Order" section of the Gateway Merchant Agreement cautions the merchant to review the separate Lease Agreement contained in the Booklet, noting that the "Bank and P[r]ocessor are not part[ies]" to that agreement. (Compl., Ex. A., at 3.) It is difficult to reconcile that statement—that the Bank is not a party to the Lease Agreement—with an intent that the Lease Agreement not be binding until the Bank has signed the Gateway Merchant Agreement.

Finally, the parties' conduct does not suggest an intent that the Gateway Merchant Agreement or Booklet not take effect without the Bank's signature. Indeed, notwithstanding the lack of a signature from the Bank, Plaintiff and Defendants began to perform their obligations under the Gateway Merchant Agreement. If the provision at issue was intended as a condition precedent, one would not expect the parties to start performing without first confirming that the Bank had signed.

Accordingly, I conclude that the failure of the Bank to sign either the Gateway Merchant Agreement or the Booklet does not render the forum selection clause in the Booklet ineffective.

**E. This Action Will Be Transferred in its Entirety, Including Claims Against Red Payments.**

Having rejected each of Plaintiff's arguments against the application of the forum selection clause, and having thus concluded that First Data's transfer motion should be granted, it remains only to determine whether this action should be transferred in its entirety, or whether Plaintiff's claims against First Data should be severed from those against Red Payments. Plaintiff suggests the latter course (severance), noting that Red Payments did not seek transfer and is not a party to the Lease Agreement containing the forum selection clause. For its part, Red Payments does not oppose transfer of the claims against it. I conclude, for the reasons set out below, that the entire action should be transferred.

Plaintiff is correct that Red Payments is not a party to the Lease Agreement containing the forum selection clause. As discussed in Part II.C., above, the Lease Agreement provides that it is between First Data and the individual merchant (here, Plaintiff). The question then is how to determine whether an entire action should be transferred when some defendants are parties to the forum selection clause and others are not.

The answer to that question is provided by a recent decision of the United States Court of Appeals for the Third Circuit. See In re Howmedica Osteonics Corp., 867 F.3d 390, 403–05 (3d Cir. 2017). That decision establishes a four-step framework, though only the first two steps need be considered here. See id. First, as to the parties bound by the forum selection clause—here, Plaintiff and First Data—the court conducts the analysis required by the Supreme Court in Atlantic Marine: determining whether the public interest factors so overwhelmingly disfavor transfer that the forum selection clause should not be enforced at all. See id. at 404. Second, the court considers "the private and public interests of the parties who have *not* signed a forum selection agreement" (here, Red Payments). Id. (internal quotation marks omitted). If steps one and two "point to the same forum,

21

then the court should allow the case to proceed in that forum, whether by transfer or by retaining jurisdiction over the entire case, and the transfer inquiry ends there." Id.

That is exactly the case here. For the reasons set out at length above, step one counsels transfer to the Eastern District of New York. Plaintiff and First Data are bound by the forum selection clause, which is valid and applicable to the claims in this case. And Plaintiff—who "bears the burden of showing that the public-interest factors overwhelmingly disfavor a transfer"—has made no effort to do so. Atl. Marine Constr. Co., 571 U.S. at 67.

Step two also counsels transfer. The party that is not bound by the forum selection clause— Red Payments—does not oppose transfer, and thus does not contend that the transfer of the claims against it would be contrary to its private interests or to the public interest. And for good reason. As to Red Payments' private interests, I note that it is a New York company, and thus is unlikely to be prejudiced by litigating this case in the Eastern District of New York. See Jumara, 55 F.3d at 879 (noting that the relevant private interests include "the defendant's preference" and "the location of books and records").

Nor would severing the claims against Red Payments, and litigating them in this district, serve the public interest. The public has an interest in judicial economy, which would, of course, suffer were the litigation of Plaintiff's factually overlapping claims to proceed in two separate courts. See In re Howmedica Osteonics Corp., 867 F.3d at 402 (noting that the "public interests . . . include judicial economy considerations, which support having the two actions in the same district (through transfer) when the two cases are in different courts but involve the same or similar issues and parties" (internal quotation marks omitted)).

Because steps one and two of the Howmedica framework both counsel in favor of transfer, this action will be transferred, in its entirety, to the Eastern District of New York.

**IV.**    **CONCLUSION**

Having concluded that this action is within the scope of a valid forum selection clause, and noting that Plaintiff has not demonstrated that the public interest factors heavily outweigh enforcement of the clause, I will grant First Data's motion, and transfer this action, in its entirety, pursuant to 28 U.S.C. § 1404(a), to the United States District Court for the Eastern District of New York.

An appropriate order follows.